## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| LAURA WAGNER, | ) | CASE NO. 1:19cv2605 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Laura Wagner ("Plaintiff" or "Wagner"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

### I.    PROCEDURAL HISTORY

On July 5, 2017, Wagner filed an application for DIB and SSI alleging a disability onset date of August 8, 2014 and claiming she was disabled due to epilepsy, diabetes, weakness on the left side,

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

and difficulty walking.  (Transcript ("Tr.") at 54, 195, 197, 226.)  The applications were denied initially and upon reconsideration, and Wagner requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 137.)

On November 5, 2018, an ALJ held a hearing, during which Wagner, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 32.)  On February 20, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id*. at 14-26.)  The ALJ's decision became final on October 8, 2019, when the Appeals Council declined further review.  (*Id*. at 1-4.)

On November 7, 2019, Wagner filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 16.) Wagner asserts the following assignments of error:

(1)     The ALJ'S determination that Ms. Wagner's Neurocognitive Disorder does not meet the criteria of Listing 12.02 is not supported by substantial evidence.

(2)     Substantial evidence does not support the ALJ'S finding that Ms. Wagner has a physical residual functional capacity for medium work.

(Doc. No. 14 at 12, 16.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Wagner was born in October 1966 and was 53 years-old at the time of her administrative hearing.  (Tr. 195, 227.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id*.)  She has past relevant work as a user support analyst. (*Id*. at 48.)

2

**B.     Relevant Medical Evidence[2]**

**1.        Mental Impairments**

On February 27, 2011, Wagner was taken to the Emergency Room after becoming progressively confused while at work.  (*Id*. at 271).   She was diagnosed with new onset hyperglycemia, hypertension, and confusion. (*Id*. at 1072.)  Ms. Wagner was then transferred to Huron Road Hospital ICU, where a brain MRI on March 1, 2011 confirmed a punctate bland acute left thalmic infarction.  (*Id*. at 1063.)

On August 19, 2016, Dr. Alan Castro, a VA psychiatrist, performed a psychiatric cognitive evaluation of Wagner.  (*Id*. at 550.)  Dr. Castro noted that Wagner had suffered a stroke five years earlier with residual motor deficits (arm and leg weakness) and that she did not believe that she was as sharp and quick as before. Dr. Castro found that Wagner displayed some cognitive deficits most likely related to her earlier cerebrovascular accident with some problems with focus, recall, and feeling overwhelmed which affects how efficiently or quickly she can do things.  (*Id*. at 553.)  Dr. Castro concluded that Wagner could function independently, but would function better if she could manage her feeling of being overwhelmed and if she would take her time in doing tasks.

On January 9, 2017, consultative examining psychologist Mitchell Wax, Ph.D., evaluated Wagner at Social Security's request.  (*Id*. at 282.)  Testing revealed a 94 full-scale IQ with a significant difference among her scores suggesting an organic problem.  (*Id*. at 285.)  Other test reversals and gaps were indicative of a learning disorder and/or organic problems.  (*Id*. at 286.) Dr. Wax noted that Wagner talked to herself under her breath while she worked through problems and

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

that there was an oddness about her.  (*Id*. at 285.)  Dr. Wax diagnosed Wagner with a personality disorder, depressive disorder, and cognitive disorder, however he identified no work-related limitations.  (*Id*. at 286.)

On June 27, 2017, a VA social worker noted Wagner's challenges living alone.  (*Id*. at 317.) Wagner's family expressed concern regrading her difficulty with hygiene and urinary incontinence and in maintaining her apartment.

On June 28, 2017, Wagner was seen at the VA's McCafferty Clinic for back pain which developed after a fall in the winter.  (*Id*. at 307.)  Physical examination revealed a left foot drop.

On July 5, 2017, Wagner's VA social worker picked her up and noted that Wagner was poorly groomed, with dirty clothes, unclean and uncombed hair, and dirty fingernails. (*Id*. at  302.)

On November 6, 2017, Wager received a neuropsychological evaluation at the

VA Hospital.  (*Id*. at 611-13.)  Wagner stated that she was independent in activities of daily living, but social work records reported significant deficits in housekeeping and hygiene, that Wagner was at risk of losing her housing because of these deficits, that moldy food had been found in her refrigerator, and that she presented to appointments in dirty clothes.  (*Id*. at 616.) Wagner's neuropsychological results were found to be valid and the doctors concluded that her functional impairment was due to cognitive difficulties as well as behavioral and personality sequelae from her stroke.  (*Id*. at 619-20.)  Testing revealed inconsistent processing speeds, below average attention and working memory, a possible impairment in sustained and directed attention and in thought organization, and an impairment in learning likely secondary to attention and executive functioning deficits.  (*Id*. at 620-22.)  The doctors concluded that "the observed level of functional impairment, coupled with her lack of insight into the severity of her functional impairment, raises concern for

her ability to function independently in an unstructured environment." (*Id*. at 622).  Wagner had been approved for ten hours per week of home health assistance, but it was recommended that if this proved insufficient, Wagner might benefit from placement in a more structured setting and the establishment of a guardianship.  (*Id*.)

Wagner was also evaluated by a speech pathologist due to attention, concentration, and word-finding difficulties.  (*Id*. at 775).  Wagner achieved normal word finding results, but exhibited mild word finding delay in conversation.  (*Id*. at 776.)  Wagner was given compensatory strategies and instructed to schedule cognitive linguistic testing.

On December 6, 2017, a VA social worker made an unannounced visit to Wagner's home and noted that Wagner's grooming and hygiene was poor, that she had not bathed since the prior Friday, that her apartment was cluttered with dirty dishes, and there was litter on her floor and furniture.  (*Id*. at 745.)

On December 28, 2017, Dr. Cindy Orlasky, a clinical psychologist, reported that multiple mental health services were involved in Wagner's treatment and that she exhibited many symptoms of schizophrenia.  (*Id*. at 722.)

On March 12, 2018, a social worker visited Wagner at home and noted she was poorly groomed and her apartment was dirty and cluttered.  (*Id*. at 694.)  Wagner was not accepting assistance from her home health aide and was warned that to remain in the community, she had to accept assistance for her health and safety.

On April 27, 2018, Nurse Practitioner Foye at the Cleveland VA completed a mental functional capacity assessment, opining that Wagner had marked restrictions in working at an appropriate and consistent pace, completing tasks in a timely manner, avoiding or ignoring

distractions, working a full day without exceeding the normal number and length of breaks, responding to demands, adapting to changes, making plans independently, and maintaining personal hygiene.  (*Id*. at 630.)  Nurse Foye noted that she had been treating Wagner at the VA since November 2017 and that Wagner has lasting cognitive impairments secondary to her stroke, that she is not able to plan well or keep up a reasonable pace, and that she requires frequent reminders for normal activities of daily living.  (*Id*.)

On July 16, 2018, Wagner's social worker observed that her clothes were clean, but her hygiene was poor and she had last showered the week before.  (*Id*. at 657.)  Wagner's electricity had been shut off the prior week even though the Plaintiff reported that she had paid her bills. (*Id*. at 657-658.)

On September 17, 2018, Wagner's social worker again noted that her grooming was poor and that she had not showered.  (*Id*. at 1101.)  Wagner refused increased visits from a home health aide.

### 2.      Physical Impairments

On February 27, 2011, Wagner was taken to the Emergency Room after becoming progressively confused while at work.  (*Id*. at 271.)  She was diagnosed with new onset hyperglycemia, hypertension, and confusion. (*Id*. at 1072.)  Ms. Wagner was then transferred to Huron Road Hospital ICU, where a brain MRI on March 1, 2011 confirmed a punctate bland acute left thalmic infarction.  (*Id*. at 1063.)

On July 3, 2013, Wagner was treated at University Hospitals ("UH") in Twinsburg for uncontrolled diabetes mellitus, hypertension, and hyperlipidemia.  (*Id*. at 674.)

On July 12, 2013, she returned to UH for a follow-up visit, and records show she had out-of-control diabetes mellitus demonstrated by an A1C level at 13.8.  (*Id*. at 670.)  Her hypertension was also uncontrolled.  (*Id*.)

On January 29, 2015, Ms. Wagner was admitted to the Veterans Administration ("VA") Hospital for hypertensive urgency and likely gastroenteritis with nausea and vomiting. (*Id*. at  504, 506, 511-513.)

On April 30, 2015, Wagner received an eye examination at the VA which revealed diabetes mellitus with possible mild nonproliferative retinopathy in the right eye and hypertensive retinopathy bilaterally.  (*Id*. at 465-466.)

On March 29, 2016, Wagner sought treatment at the VA emergency room for hypertensive crisis. (*Id*. at 438.)  Notes state her medical history included diabetes mellitus and a cerebrovascular accident with left-sided hemiparalysis.  (*Id*.)  Examination revealed elevated blood pressure and trace ankle edema.  (*Id*. at 439-440, 442.)

On June 3, 2016, Wagner transferred her care to the VA's McCafferty Clinic.  (*Id*. at 414-416.)  Examination records document a shuffling gait.  (*Id*.)

On December 14, 2016, consultative examining physician Dr. Robin Benis evaluated Wagner at Social Security's request.  (*Id*. at 272.)  On examination, Dr. Benis noted Wagner had an abnormal, slightly antalgic gait where she dragged her left leg due to weakness, a partial ability to squat, and impaired hygiene.  (*Id*. at 273-274.)  She also found normal range of motion and muscle testing, no muscle spasms, and no sensory deficit.  (*Id*. at 19, 22, 276-79.)  Wagner  did not need an assistive device, was able to change for the examination, got on and off the examination table on her own, and rose from a chair without difficulty.  (*Id*.)  Dr. Benis diagnosed hypertension, diabetes type

2, high cholesterol, history of stroke in 2011, left-sided weakness, memory impairment, and speech impairment.  (*Id*. at 275.)  She concluded that Wagner has mild limitations in standing, walking long distances, and going up and down stairs due to mild weakness on her left side and balance problems, and some problems with memory and speech.

On August 12, 2017, consultative medical examiner Dr. Freeland Ackley examined Wagner at Social Security's request.  (*Id*. at 587.)  Dr. Ackley found that the Wagner's medical conditions were well controlled and that she could walk, stand and sit for over one hour at a time and could lift 20 pounds.  (*Id*. at 590.)

On October 26, 2017, Wagner received physical therapy at the VA for back pain, knee pain, and an unsteady gait. (*Id*. at 798.)  The therapist observed Wagner ambulated with an increased lean to the left lower extremity with push off of the right knee with full extension, a decreased cadence, and mild ataxia. (*Id*.)  Physical examination also revealed decreased reflexes, decreased upper extremity coordination bilaterally, uncoordinated and difficult alternating upper/lower extremity movements, decreased, slow heel to shin movement, and weakness in the distal left upper extremity - wrist/grip.  (*Id*. at 799-800.)

On January 16, 2018, an MRI of Wagner's brain revealed extensive white matter hyperintensity and chronic ischemic changes secondary to hypertension and diabetes.  (*Id*. at 625-626).

On March 8, 2018, her physical therapist noted Wagner had achieved an improved gait and foot clearance even though she still inverted her ankle and had decreased right knee flexion. (*Id*. at 696.)

8

On April 27, 2018, Nurse Practitioner Foye at the Cleveland VA completed a functional capacity assessment of Wagner.  (*Id*. at 627-628.)   She opined that Wagner had the following limitations: lifting and carrying 15 pounds frequently and 30 pounds occasionally, standing and walking for one-half hour at a time, up to three hours total, occasional reaching, pushing, pulling, and fine manipulation, and with the need for a sit/stand option.  (*Id*.)  Nurse Foye based these restrictions on Wagner's cerebrovascular accident, left-sided weakness, impaired gait, impaired balance, impaired mobility, and right knee pain with osteoarthritis.  (*Id*.) She opined that Wagner's impairments would take her off task, cause absences, and require extra breaks.  (*Id*. at 628.)

**C.      State Agency Reports**

**1.       Mental Impairments**

On July 26, 2017, state agency psychologist Joseph Edwards, Ph.D., reviewed Wagner's record at Social Security's request and concluded that she could perform one to four step tasks, in settings with superficial contact, and where major changes are explained in advance.  (*Id*. at 66-67.)

On September 27, 2017, state agency psychologist Robyn Murry-Hoffman, Ph.D., reviewed Wagner's record and affirmed the limitations identified by Dr. Edwards.  (*Id*. at 95-96.)

**2.       Physical Impairments**

In August and September 2017, state agency doctors Anton Freihofner, M.D., and Obiaghanwa Ugbana, M.D., reviewed the record and opined that Wagner did not have any severe physical impairments.  (*Id*. at 62, 91.)

**D.      Hearing Testimony**

During the November 5, 2018 hearing, Wagner testified to the following:

•       She is disabled because she has short-term memory issues and is constantly in pain. (Tr. 39.)

9

- She lives alone, and has to climb seven stairs to reach her apartment.  (*Id*. at 40.)

- She completed high school and received associates degrees in information systems and business management.  (*Id*.)

- She previously worked as a tech support person for computers.  (*Id*. at 41.)

- There is a washer and dryer in the basement of her building.  She does laundry about once a week.  (*Id*. at 42.)

- She drinks diet soda and smokes about 10 cigarettes per day.  (*Id*. at 42-43.)

- She treats her back pain with Tylenol.  (*Id*. at 43.)

- She lost her tech support job because her employer felt she was working too slowly.  (*Id*.)

- After losing her job, she became homeless.  She got her current apartment through the VA, and the VA also provides a home health aide who comes five days a week for two hours per day.  (*Id*. at 43-44.)

- Prior to receiving the home health aide, she was facing eviction due to the unclean state of her apartment.  (*Id*. at 44-45.)

- In the past six months, she began dating someone who reminds her to shower and clean herself daily.  Prior to that, she had problems remembering to do those things.  (*Id*. at 45-46.)

- She can't purchase personal hygiene products because she has no income.  (*Id*. at 46.)

- About once a month, her left arm and leg go "numb" for a day, and during this time they move more slowly.  (*Id*. at 47.)

- The Tylenol "sometimes" helps with her back pain.  Lifting things makes the pain worse, and a hot shower or bath makes the pain better.  (*Id*. at 48.)

- She has problems remembering birth dates, and also will get stuck in a conversation when she can't recall "a word that I've known for years . . . . I'll struggle with it so long to the point where I'll start cussing."  (*Id*. at 49.)

- She uses a set of seven pill boxes to keep track of her medication.  (*Id*. at 50.)

10

- She has no problems watching tv and reading books.  (*Id*.)

- She can sit for maybe 20 minutes before she needs to get up and move, can walk a quarter mile and lift 20 pounds once, but not repeatedly.  (*Id*. at 51.)

- She takes Prozac for depression, and it helps.  (*Id*. at 52.)

The VE testified Wagner had past work as a user support analyst.  (*Id*.)  He testified there are no transferrable skills with that position.  (*Id*. at 53.)    The ALJ then posed the following hypothetical question:

> female, 52 years of age, same education and work background as Ms. Wagner.  This first person can left/carry 50 pounds occasionally, 25 pounds frequently, can stand/walk six out of eight, can sit six out of eight.  This person is right dominant.  Push/pull would be consistent with right upper extremity    frequent with the left.  Foot pedal would be consistent with the right lower extremity    frequent with the left.  This person can frequently use a ramp or stairs, can never use a ladder, rope or a scaffold, can constantly balance, frequently stoop, kneel, crouch, and crawl.  Manipulative capabilities are as follows    reaching constant with the right, frequent with the left, and that is all plains.  Handling, fingering, and feeling would be constant with the right, frequent with the left.    Visual incapabilities and communication skills are constant.  This person should avoid dangerous machinery and unprotected heights.  Additionally, this person can do simple, routine tasks    no complex tasks.    This person should also have only superficial interpersonal interactions with the public, coworkers, and supervisors.  And by superficial I'm defining that to mean no arbitration, confrontation, negotiation, supervision, or commercial driving, and that's it.

(*Id*. at 53-54.)

The VE testified the hypothetical individual would not be able to perform Wagner's past work as user support analyst.  (*Id*. at 54.)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as store laborer,  cleaner, and production helper.  (*Id*.)

The ALJ posed a second hypothetical, changing the lift/carry limitation by reducing it to 20 pounds occasionally, 10 pounds frequently.  (*Id*.)  The VE testified the hypothetical individual would

still be able to perform representative jobs in the economy, including retail marker, office cleaner, and produce weigher.  (*Id*. at 54-55.)

On cross-examination, the VE testified that being off-task 20% of the workday, being absent two or more days per month, or needing to be "frequently redirected in the workplace due to lapses in concentration and focus" would preclude competitive work.  (*Id*. at 55-56.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.   20 C.F.R.  §§ 404.1520(c) and 416.920(c).   A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at

923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Wagner was insured on her alleged disability onset date, January 1, 2015, and remained insured through December 31, 2019, her date last insured ("DLI.")  (Tr. 14.)  Therefore, in order to be entitled to DIB, Wagner must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since January 1, 2015, the amended onset date.

3. The claimant has the following severe impairments: status post-cerebrovascular accident, obesity, neurocognitive disorder, personality disorder, and affective

13

disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is right dominant. She can push and pull constantly with the right upper extremity, but only frequently with the left upper extremity. She can operate foot pedals constantly with the right lower extremity. However, she can only operate foot pedals frequently with her left lower extremity. The claimant can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can constantly balance, but only frequently stoop, kneel, crouch, and crawl. She can reach constantly with the right upper extremity, but only frequently with the left upper extremity, in all plains. She can constantly handle, finger, and feel with the right upper extremity, but only frequently handle, finger, and feel with the left upper extremity. Her visual capabilities and communication skills are constant. She should avoid dangerous machinery or unprotected heights. She can complete simple routine tasks, but no complex tasks. She should only have superficial interpersonal interactions with the public, her co-workers, and her supervisors, meaning no arbitration, confrontation, negotiation, supervision, or commercial driving.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on October **, 1966 and was 49 years old, which is defined as a younger individual age 18-49, on the amended onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2015, through the date of this decision.

(Tr. 14-26) (internal citations omitted).

14

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act,

without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

16

## VI.  ANALYSIS

**A.**    **Whether Wagner's Neurocognitive Disorder Meets the Criteria of Listing 12.02**

Wagner asserts the ALJ erred because his determination that her neurocognitive disorder did not meet or equal a listed impairment is not supported by substantial evidence and is premised upon the application of inappropriate legal standards.  (Doc. No. 14 at 12.)

The Commissioner responds that the ALJ reasonably found that Wagner did not meet the criteria of Listing 12.02 for neurocognitive disorders. (Doc. No. 16 at 5.)  He notes the ALJ's Listing analysis is supported by the fact that no medical source opined that Wagner met or equaled any listing.  (*Id.* at 6.)   He asserts the ALJ's decision is supported by substantial evidence in the record, and is therefore entitled to deference from this court.  (*Id.* )

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See*  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."   20 C.F.R. §§ 404.1525(a), 416.925(a).   Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed

17

impairment.  *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425 at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16  3266, 2017 WL 4216585 at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, No. 17-4158, 2018 WL 3414141 at *4 (6th Cir. July 13, 2018) (same).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227 at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review . . . This court has stated that 'the ALJ must build an accurate and logical bridge between the

18

evidence and his conclusion.'") (quoting *Woodall v. Colvin*, No. 5:12 CV 1818, 2013 WL 4710516 at *10 (N.D. Ohio Aug. 29, 2013).

Here, Wagner argues the ALJ erred in finding she did not meet the requirements of Listing 12.02.  That Listing defines "Neurocognitive disorders" as follows:

**1. Neurocognitive disorders (12.02).**

a. These disorders are characterized by a clinically significant decline in cognitive functioning. Symptoms and signs may include, but are not limited to, disturbances in memory, executive functioning (that is, higher-level cognitive processes; for example, regulating attention, planning, inhibiting responses, decision-making), visual-spatial functioning, language and speech, perception, insight, judgment, and insensitivity to social standards.

b. Examples of disorders that we evaluate in this category include major neurocognitive disorder; dementia of the Alzheimer type; vascular dementia; dementia due to a medical condition such as a metabolic disease (for example, late-onset Tay Sachs disease), human immunodeficiency virus infection, vascular malformation, progressive brain tumor, neurological disease (for example, multiple sclerosis, Parkinsonian syndrome, Huntington disease), or traumatic brain injury; or substance-induced cognitive disorder associated with drugs of abuse, medications, or toxins. (We evaluate neurological disorders under that body system (see 11.00). We evaluate cognitive impairments that result from neurological disorders under 12.02 if they do not satisfy the requirements in 11.00 (see 11.00G).)

20 CFR Part 404, Subpart P, Appendix 1, at Listing 12.00B1.  To satisfy the requirements of Listing 12.02, a claimant must have a neurocognitive disorder as described above and the following:

A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas:

1. Complex attention;

2. Executive function;

3. Learning and memory;

4. Language;

19

5. Perceptual-motor; or

6. Social cognition.

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1).

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 CFR Part 404, Subpart P, Appendix 1, Listing 12.02.  To meet Listing 12.02, a claimant must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C.  *See* 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.00A2; Listing 12.02.

The ALJ determined that Wagner suffers from a severe neurocognitive disorder.  (Tr. 20.)

At step three, the ALJ stated that he considered Listing 12.02 and addressed the paragraph B and

C criteria[3]  for that Listing as follows:

> The severity of the claimant's mental impairments, considered singularly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.08.  In making this finding, I have considered whether the "paragraph B" criteria are satisfied.    To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately  or effectively, and on a sustained basis.
>
> In understanding, remembering, or applying information, the claimant has moderate limitations.  The record contains evidence of a diagnosis for mild cognitive disorder.  The claimant reported cognitive difficulties, including needing frequent reminders from others, misplacing items frequently, remembering what people have said, getting lost or turned around in familiar places, and remembering appointment dates and when to take medications.  The claimant's aunt has also voiced concern about the claimant's judgment.  Despite the above concerns, the record generally demonstrates a less severe cognitive impairment.  Although the claimant has reported memory problems to her consultative examiner, the examiner did not note any major memory problems.  During other examinations over the period at issue, the claimant demonstrated thought processes that were logical and coherent, although tangential.  She was evaluated to have an intelligence quotient (IQ) in the average range of intelligence, an intact ability to both plan and organize, and no behaviors indicative of cognitive dysfunction.  Such findings substantiate not more than moderate limitation in this area.
>
> In interacting with others, the claimant has moderate limitation.  During several evaluations, the claimant has reported issues with slurred speech and difficulty with rocking due to her anxiety.  The claimant was evaluated to have a severe impairment in phonemic generative naming and a moderate impairment in semantic generative naming.  The claimant has also been observed to be quick

---

[3] Because the ALJ found Wagner did not meet the requirements of either Paragraphs B or C, the decision did not address the Paragraph A criteria of Listing 12.02.

to anger and more irritable since her stroke.  However, despite these reported symptoms, the claimant was tested to have an estimated verbal IQ in the above-average range.  During examinations, despite appearing to provide false or inaccurate information, she was noted to be pleasant and cooperative; have logical, coherent, and goal-directed speech; and make good eye contact.  The claimant has also self-reported participating in social activities such as having three to four friends, visiting with her friends or contacting them frequently during the week, and attending church weekly.  Such findings substantiate no more than moderate limitations in this area.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  The claimant has reported difficulty with switching from one activity to another, losing her train of thought, issues concentrating, and problems completing activities.  She alleged that she has decreased ability to concentrate due to her stroke.  The claimant also demonstrated evidence of mental confusion during her consultative examination.  At said examination, claimant's ability to concentrate was assessed as good.  At a subsequent examination during that period, the claimant underwent neurological testing that revealed a below-average attention span.  However, generally, the claimant demonstrated only a mild impairment as to her processing speeds.  At the hearing, the claimant also testified to performing activities such as housework and watching television, as well as not needing reminders to take her medications.  Such findings substantiate no more than moderate limitations in this area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation.  The claimant as reported does not believe she has mental or emotional problems; however, she has been noted to appear anxious.  The claimant's insight and judgment were and[ sic] assessed to be poor, and the claimant was also observed to share delusional beliefs, including reporting she has completed more schooling than in reality.  The record contains instances in which the claimant presented to examination and treatment visits with poor hygiene, and observed poor hygiene in her living space as her space contained trash on her floors and moldy food.  However, over the period, the claimant was educated about her hygiene, and her hygiene was noted to be improving.  The claimant also presented to these visits in an improving or good mood when on medications generally, and reported an ability to maintain a consistent, independent routine.  Such findings substantiate a moderate limitation in this area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

22

> I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria.  There is no evidence of marginal adjustment, defined as the minimal capacity to adapt to changes in the claimant's environment or to demands not already part of her daily life.  The claimant has reported the ability to maintain varied routine independant of assistance from others, and the record shows that the claimant is able to go out in public for purposes other than doctor appointments.

(Tr. 20-22) (internal citations omitted).

The Court finds substantial evidence supports the ALJ's determination that Wagner does not meet the requirements of Listing 12.02.  With regard to the paragraph B criteria, the ALJ first concluded Wagner had a moderate limitation in the category of understanding, remembering, or applying information.[4]   He acknowledged that Wagner has a cognitive disorder, but noted that consultative examiner Dr. Wax determined her IQ was "in the average range of intelligence," and found she performed well on Digit Span and word recognition tasks.  (*Id*. at 289.)  He also cited notes from Dr. Serna's neuropsychological evaluation showing Wagner had "Intact" planning and organizational skills, and "Mild" to "Moderate" impairment in other areas including working memory and non-routine problem solving.  (*Id*. at 738.)  Finally, he cited VA treatment notes from October 2017 which described Wagner as demonstrating "no behaviors indicative of cognitive dysfunction."  (*Id*. at 823.)  All of this provides substantial evidence for the ALJ's conclusion that Wagner had moderate impairment in this area.

---

[4] The regulations define this category as follows: " This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions."  Listing 12.00E1.

23

The ALJ next concluded that Wagner had moderate limitations in the category of interacting with others.[5]  (*Id*. at 17.)  He noted that she sometimes had slurred speech, rocking, and difficulties recalling words, as well as being described as quicker to anger and more irritable since her stroke.  (*Id*.)  However, he also noted Dr. Serna's findings of average IQ, pleasant and cooperative demeanor during examination, "logical, coherent, and goal-directed" speech, and good eye contact.  (*Id*. at 737-38.)  Dr. Wax opined Wagner "would be able to respond appropriately to supervisors and coworkers in a work setting based on her ability to get along with others while living in her [homeless] shelter the past nine months."  (*Id*. at 291.)  Finally, the ALJ cited Wagner's self-report of maintaining friendships through daily contact with one of her "three or four friends," as well as weekly contact with her sister-in-law and her daughter, and engaging in social activities such as church.  (*Id*. at 17, 288.)  Thus, substantial evidence supported the ALJ's conclusion that Wagner had moderate impairment in this area.

The ALJ also concluded Wagner had moderate limitations in the category of concentrating, persisting, or maintaining pace.[6]   He noted that consultative examiner Dr. Wax

---

[5] The regulations define this category as follows: "This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." Listing 12.00E2.

[6] The regulations define this category as follows: "This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or

24

described Wagner's ability to concentrate as "good," and opined Wagner had the ability to understand, remember, and carry out instructions on a job, based on her ability to maintain high grades in her college classes.  (*Id*. at 22, 286.)  The ALJ cited testing by neuropsychologist Dr. Serna, which showed "good" concentration, a below-average attention span, and "mild" impairment in her mental processing speed.  (*Id*. at 17.)  He also cited Wagner's testimony that she could read and follow the plot of a movie or television show, and needed no reminders to take her medication. (*Id*. at 17, 288.)  Therefore, substantial evidence supported the ALJ's conclusion that Wagner's limitations in this area were moderate.

The ALJ also concluded Wagner had moderate limitations in the area of adapting or managing onself.[7]  (*Id*. at 17.)  He notes that, while she had a period of struggling to maintain proper hygiene, after she was educated about this issue, her providers reported that her hygiene improved.   (*Id*. at 17, 634, 647).  Although Wagner points to the December 2017 opinion of Dr. Serna, which noted "concern for her ability to function independently in an unstructured environment," this opinion also noted that Wagner had just been approved for 10 hours a week of assistance from a home health aide, and the record shows a more structured environment was never required.  (*Id*. at 622.)  The ALJ acknowledged Wagner has deficits in this area, but determined the

---

distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." Listing 12.00E3.

[7] The regulations define this category as follows: "This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions."  Listing 12.00E4.

evidence showed these limitations were not consistent throughout the period at issue, and improved with treatment.  (*Id.* at 17.)  For example, in his August 2016 evaluation, Dr. Castro opined that Wagner could function independently.  (*Id.* at 553.)  After she received education about personal hygiene, Wagner's self-care improved, and consultative examiner Dr. Wax opined that Wagner "would be able to maintain herself in the community without outside resources."  (*Id.* at 17, 289.) Further, the ALJ cited evidence showing that medication was effectively treating Wagner's affective disorder and enabling her to maintain a consistent, independent routine.  (*Id.* at 17.)  This provides substantial evidence in support of the ALJ's conclusion that Wagner's limitations in this area were moderate.

Finally, the ALJ determined the paragraph C criteria were not met because Wagner self-reported an ability to maintain a varied routine without of assistance and was able to go out in public for purposes other than doctor appointments.  (*Id.* at 18, 284.)  Wagner argues that the same evidence which demonstrated she meets the paragraph "B" criteria also establishes that she is living on her own only with medical and psychosocial support and assistance from a home health aide, and that these arrangements are "proving to be insufficient."  (Doc. No. 14 at 15.)   The ALJ, however, drew a different conclusion.  In addition to the evidence he considered in his evaluation of the paragraph "B" criteria, the ALJ cited Dr. Wax's report that Wagner was able to manage her own funds, take responsibility for a variety of chores at the homeless shelter where she was then living, and independently take a bus to her community college classes, where she earned good grades.  (Tr. 17, 288.)  This constitutes substantial evidence in support of the ALJ's finding that Wagner does not satisfy the paragraph C criteria.

**B.      Whether Substantial Evidence Supports the ALJ's Conclusion that Wagner Can Perform Medium Work**

Wagner asserts that the ALJ also erred in concluding that she was capable of "medium" work, because this determination was not supported by substantial evidence.  (Doc. No. 14 at 16.) She argues that the ALJ relied too much on her self-reported activities, and overlooked the fact she required assistance from a home health aide five days a week.  (*Id*.)

The Commissioner responds that the ALJ reasonably evaluated the record and supported his RFC determination with substantial evidence.  (Doc. No. 16 at 8.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96‑8p, 1996 WL 374184 at * 7 ("The RFC assessment must

27

always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her*, 203 F.3d at 391.

In dispute here is the ALJ's determination that Wagner was capable of "medium" work, which is defined in the regulations as follows:

> A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8 hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time.

Social Security Ruling ("SSR") 83  10, 1983 WL 31251 at *6 (1983).

In this case, the medical evidence is susceptible to multiple interpretations.  The state-agency reviewed the record and opined that it showed Wagner did not have any severe physical impairments.  (*Id*. at 62, 91.)  The ALJ disagreed, determining that the record showed Wagner had physical limitations resulting from her stroke that required specific limitations in the RFC, including the restriction to "medium work."  (*Id*. at 14.)  Wagner disagrees with both these opinions, asserting that the finding she can perform medium work "is not supported by evidence which a reasonable person would accept as adequate support for such a proposition."  (Doc. No. 14 at 17.)

The ALJ first noted that, after recovery from her 2011 stroke, Wagner was able to return to work, and "worked for years with this condition." (Tr. 23.)   He cited examination notes from the beginning of the relevant period, January 2015, that showed "intact motor strength in both extremities, intact grip strength and only slightly reduced strength in her lower extremities."  (*Id*.) He also cited treatment notes throughout the relevant period showing normal range of motion in

28

all extremities, although a limp and impaired ability to squat which were documented in 2016 and 2017. (*Id*. at 23-24.)  Further, he cited  treatment notes showing Wagner's gait improved in 2018, and she continued to have normal range of motion in all extremities.  (*Id*. at 24.)  He also found "persuasive" the opinion of consultative examining physician Dr. Benis, who opined Wagner had "mild" limitations to standing, walking long distances, and going up and down stairs.  (*Id*. at 26.)

Wagner's assertion that the ALJ relied too heavily on her self-reported activities is refuted by the ALJ's discussion of the medical examination and treatment records underlying his determination.  The ALJ also acknowledged the assistance of the home health aide, while noting that Wagner testified she could perform household chores without assistance.  (*Id*. at 24.)  While Wagner points to other evidence in the record that could be used to support a more restrictive RFC finding, this Court cannot re-weigh the evidence.  *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999).  The ALJ cited substantial evidence that reasonably supports his RFC determination, and therefore this Court must defer to his decision.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date:   June 23, 2020

29